# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEAN BEER,<br>547 Daventry Road<br>Berwyn, PA 19312<br><br>Plaintiff,<br><br>v.<br><br>MONTGOMERY COUNTY,<br>LEE SOLTYSIAK, DR. VALARIE<br>ARKOOSH, KENNETH LAWRENCE JR.<br>and JOSEPH C. GALE, in their official<br>capacities,<br>One Montgomery Plaza, Suite 800<br>Norristown, PA 19401<br><br>Defendants | NO. **20   1486**<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

### INTRODUCTION

Plaintiff, the Chief Public Defender for Montgomery County from January 2016 until February 2020, was removed from his position for filing an amicus curiae brief that detailed Montgomery County's unlawful bail practices, provided specific examples of Montgomery County citizens bearing the brunt of those unlawful bail practices, and explained how statewide guidelines would increase accountability and compliance.

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4). This court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367. Declaratory relief is authorized by 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57. Injunctive relief is authorized by Federal Rule of Civil Procedure 65.

2. This Court has personal jurisdiction over the defendants who are located in the Eastern District of Pennsylvania.

3. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(a) in that the defendants are subject to personal jurisdiction within the Easter District of Pennsylvania and the events that give rise to this action occurred within the Eastern District of Pennsylvania.

## PARTIES

4. Plaintiff Dean Beer was the Chief Public Defender in the Office of the Public Defender ("OPD") of Montgomery County, Pennsylvania from January 2016 until his abrupt removal from that position on February 26, 2020. As Chief Public Defender, Plaintiff Beer was responsible for managing the OPD: overseeing its lawyers and employees, establishing its policies, managing its budget, and ensuring its compliance with constitutional, statutory, and professional/ethical guidelines. Plaintiff Beer had ultimate professional responsibility for the representation of all the OPD's clients.

5. Defendant Montgomery County is the third largest county in Pennsylvania and is a "Public Body" as defined by 43 P.S. § 1422(2).

6. Defendant Lee Soltysiak is the Chief Operating Officer for Montgomery County. Defendant Soltysiak assumed this position on January 18, 2018.

7. Defendant Dr. Valarie Arkoosh has been Montgomery County Commissioner since January 2015. She has been the Chair of the Montgomery County Board of Commissioners since her election on November 17, 2016.

8. Defendant Kenneth Lawrence Jr. has been the Vice- Chair of the Montgomery County Board of Commissioners since February 2, 2017.

9. Defendant Joseph Gale was elected to the Montgomery County Board of Commissioners in November 2015.

10. All individual defendants are sued in their individual and official capacities. At all times hereinafter mentioned, these defendants were acting within the scope of their official duties and under color of state law.

## FACTUAL BACKGROUND

11. The Pennsylvania Public Defender Act requires each County to appoint a public defender, who is directed to provide representation to indigent criminal defendants where constitutionally mandated. 16 P.S. §§ 9960.3, 9960.6.

12. The right to counsel anchors our criminal justice system: "Without counsel, the right to a trial itself would be 'of little avail' . . . 'Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have." *United States v. Chronic*, 46 U.S. 648, 653-54 (1984) (citing *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932)).

13. Plaintiff Beer was, until February 26, 2020, the Chief Public Defender in Montgomery County, Pennsylvania. Plaintiff Beer has been a licensed attorney since 1982, and is licensed to practice law in Pennsylvania, California (inactive) and North Carolina (inactive). Over the past four decades his diverse practice has included representing: Farmworkers in California, families and students under the Individuals with Disabilities Education Act, and indigent defendants at the Mecklenburg Public Defender in Charlotte, North Carolina and the Defender Association of Philadelphia for over a decade before being hired as the Deputy Chief Defender of Montgomery County in 2013.

14. Plaintiff was Deputy Chief Defender from September 2013 to August 2015 when he began Interim Chief Defender until January 2016 when he was appointed Chief Defender.

15. While at the OPD he joined and became a board member of the Pennsylvania Pretrial Services Association ("PPSA"). As their website states, "PPSA is an organization of professionals who are dedicated to the advancement of pretrial-release services and community-based, non-incarcerative alternatives for the disposition of criminal cases." Plaintiff joined and contributed to PPSA despite Montgomery County not having a pretrial services unit so that he could learn the best practices across the Commonwealth with the goal of then implementing them in Montgomery County

### *Plaintiff's Advocacy For Constitutionally Mandated Representation of Indigent Defendants and Improved Bail & Pretrial Procedures*

16. As Chief Defender, Plaintiff expressed concern over the effect of the cash bail system on indigents accused of crime as well as Montgomery County's failure and refusal to provide representation for indigent defendants at preliminary arraignments where bail is set.

17. As Chief Defender, Plaintiff was a member of Montgomery County's Criminal Justice Advisory Board ("CJAB"). CJAB consisted of approximately fifteen to twenty members of Montgomery County criminal justice stakeholders including: the OPD, the Montgomery County Office of the District Attorney, County Court Administration, and County Probation and Parole.

18. In 2016, Plaintiff and the Montgomery County Department of Probation & Parole submitted proposals to CJAB regarding Montgomery County's bail procedures. Plaintiff's proposal called for eliminating cash bail on non-violent misdemeanor offenses. Plaintiff also secured the University of Pennsylvania Law School's Quattrone Center for the Fair

Administration of Justice to serve a monitoring function to track those who were released without bail and document whether they attended court appearances and/or were arrested for new offenses. The Center agreed to act as a monitor, pro bono, thereby eliminating any cost to Montgomery County. Probation and Parole's proposed plan called for additional restrictions on defendants' release from incarceration beyond the cash bail set by the magistrate judge and proposed a budget of approximately two-hundred thousand dollars for program implementation.

19. Plaintiff detailed his objections to the Probation and Parole plan in writing, asserting that the plan was illegal because it imposed restrictions on defendants in excess of those permitted by the Pennsylvania Rules of Criminal Procedure, and criticized the proposed budget as a waste of County resources. CJAB did not adopt either plan, instead maintaining the status quo of permitting cash bail to be set on non-violent misdemeanor offenders, many of whom are indigent and appeared at bail hearings without counsel.

20. On December 6, 2018 Plaintiff responded to an inquiry from Defendants Arkoosh and Soltysiak as follows:

> You asked if the bail situation was as bad here as in Philadelphia.
> It is worse. In Philadelphia 42.5% of the arrestees are assigned
> some form of cash bail. Based on information from the AOPC
> provided by the ACLU, 23 of the 30 Magisterial Districts Judges in
> Montgomery County impose cash bail in over 44% of the cases,
> many as high as 60-70%. Many of these Districts are in the poorer
> communities, including Pottstown and Norristown.

21. Six months later, Plaintiff again expressed his concern about the lack of representation for defendants at bail hearings to Defendants Arkoosh and Soltysiak writing as follows:

> If however the County is going to adopt these tools [risk
> assessment instruments], it is necessary that there is representation
> for defendants at first appearance, when bail is determined… As
> we move towards a pre-trial program it is important that we also

5

include representation at first appearance. This is not only best
practices it is the right thing to do.

22. Approximately a month later, in June 2019, Plaintiff followed up with Defendants Arkoosh and Soltysiak:

> I have been approached by a group of researchers/economists from Harvard, Princeton and Arnold Ventures to have the County participate in a 18-24 month study on the impact of race in judicial bail decisions. This is zero coast [sic] to the County. This can coincide with the beginning of the proposed pre-trial program.
> …
> Documenting the racial impact of bail decisions will be the first step in addressing the problems in the criminal justice area.

23. Plaintiff urged adoption of a pilot program he had been working on with Court Administration, and specifically, President Judge Thomas M. DelRicci, to provide attorney representation for 30-40 defendants a week at bail hearings. This program would be operated by the court and would allow for representation by the OPD for indigent defendants, as well as representation for the Commonwealth by the Office of the District Attorney. In addition to providing for counsel, alternatives to cash bail and pretrial incarceration, such as text-messaging and phone-call reporting, would be incorporated into the pilot program.

24. On July 22, 2019, Plaintiff emailed Defendant Soltysiak and Montgomery County Chief Financial Officer Dean Dortone, to provide an overview of the proposed Pretrial Program, along with a detailed memorandum that set forth:

   a. Ten anonymous examples demonstrating the unfair nature and harmful effect of cash-bail,
   b. a breakdown of risk assessment tools and articles detailing their strengths and weaknesses,
   c. a detailed explanation of "the importance of presence of counsel at first appearance," and
   d. a statistical analysis of average bail per charge and corresponding time of incarceration.

25. In September 2019, Plaintiff Beer was informed that Montgomery County, through Administrative Judge of Treatment Courts and Adult Probation, Steven O'Neill, implemented a new probation policy referred to as Evidence Based Practices ("EBP") wherein probationers who were alleged to have violated the terms of their probation, were being asked to waive counsel to avoid the filing of a formal violation. Probationers were then incarcerated between two and thirty-days awaiting drug and alcohol assessments.

26. In response Plaintiff Beer wrote to Judge O'Neill:

> This process is substantially similar to the recently terminated practice of uncounseled colloquies in the office of Adult Probation. Since our office is required to represent all incarcerated defendants on Gagnon hearings, unless private counsel enters their appearance, our appointment attaches at the time they are detained. I do not believe it is appropriate for probation to have waivers of counsel signed once counsel has already been obtained. This is my understanding of the program.

27 Judge O'Neill responded in an email on September 19, 2019, taking issue with Plaintiff Beer's claim that the OPD "is required to represent all incarcerated defendants in Gagnon hearings:"

> I have reviewed the Rules regarding Entry/Withdrawal of Appearance (Pa R. Cr. P 120); Appointment of Counsel (Rule 122); and Application for Assignment of Counsel (Rule 123) and find no authority for your contention. Is there a current Court Order requiring your office to represent "all incarcerated defendants on Gagnon hearings"? I have reviewed the Dockets on a number of pending Gagnons, and note that the attorneys from your Office do not file and Entry of Appearance as required by Rule 121. The only procedure I am aware of regarding representation at Gagnons is that your office, as well as the DA's Office, is notified of pending Gagnons by individual Judges and you assign counsel to appear at the hearing. No Court Appointment is filed in the docket. I also note that even if there was *prior* representation of a Defendant by a member of your office, that representation would only be effective until final judgment on the underlying case. (Rule 122(B)(2).

Plaintiff Beer responded,

> Under the Public Defender Act, Section 6, (10) we are responsible for furnishing legal counsel for probation and parole hearings, and revocation thereof, to anyone who cannot afford an attorney... Our office deems anyone incarcerated for a probation violation as indigent. This is a practice that is beneficial both to our clients and the Courts...Regardless of formalities surrounding the time and manner of our appointment, and the scope of our representation when listed as attorney of record on the docket, the EBP program is problematic...It was disturbing to learn of a court-sanctioned practice in which individuals are accused of violations, incarcerated, and then non-attorney probation officers present them with a form alleging to be a waiver of both their right to counsel and to a hearing.

Judge O'Neill responded,

> As to your specific allegations regarding the use of Evidence Based Practices (EBP) Program in certain cases (in an effort to limit the length of incarceration of Defendants in Violation status) I do not agree with any of your contentions. No further elaboration is necessary. Nevertheless, due solely to your allegations, effective September 20th, the Adult Probation Department has informed me that the EBP Program has been discontinued.

### *The Philadelphia Bail Fund Complaint*

27.  On March 19, 2019, seventeen plaintiffs, including the Philadelphia Bail Fund, filed a Class Action Complaint and Petition for a Writ of Mandamus, under *The Philadelphia Community Bail Fund, et al., v. Arraignment Court Magistrates of the First Judicial District of the Commonwealth of Pennsylvania*, 21 EM 2019 (E. D. Pa. 2019).

28.  On July 8, 2019, the Supreme Court of Pennsylvania invoked its King's Bench jurisdiction to conduct an inquiry "relative to the operation of the cash-bail system in the First Judicial District."

29.  The Court continued, "The inquiry shall be limited to Petitioners' allegations regarding systemic failures of the First Judicial District to properly conduct cash-bail matters

8

pursuant to current law, as well as any suggestions for action by this Court in response to those alleged systemic failures. Any attempt to advocate for the abolition of cash bail will not be entertained."

30. On December 16, The Honorable John M. Cleland, Sr. Judge, issued his report as the Special Master. Judge Cleland. found that Philadelphia's bail system is "fundamentally sound" and therefore he recommended "improvements" instead of "reforms" to Philadelphia's bail system. These improvements include: (1) additional opportunity for defendants to communicate with their attorney before and during the bail hearing, (2) a clear explanation to the defendant of the imposed bail by the magistrate, (3) a presumption of the defendant being releasable, (4) an agreement that magistrates can order a defendant held without bail, (5) monetary conditions must consider a defendant's ability to pay, (6) a defendant held without bail shall be entitled to a Release Determination Hearing within three business days, when practicable, (7) any defendant who remains in custody after a bail hearing shall be entitled to a Bail Review Hearing within three business days, and (8) any defendant who remains in custody should be afforded an expedited preliminary hearing.

31. Over the next two months many organizations filed amicus curiae briefs, including: The Pennsylvania Association of Criminal Defense Lawyers, The Juvenile Law Center, The Defender Association of Philadelphia, The Quattrone Center for the Fair Administration of Justice, Harvard and MIT Algorithmic Justice Interdisciplinary Research Group, and Americans for Prosperity Foundation, among others.

### Plaintiff Exposes Montgomery County's Unlawful Bail Practices

32. Plaintiff Beer, along with Lee Awbrey, OPD's Chief of Appeals, prepared an amicus curiae brief to be filed by the OPD.

33. On February 3, 2020, as a courtesy, Plaintiff Beer emailed Defendant Soltysiak and Josh Stein, Montgomery County's Solicitor, a draft of the brief he was planning to file.

34. The OPD filed the brief that afternoon.

35. The brief provided an overview of the systemic problems in Montgomery County's bail procedures.

> Montgomery County is one of many in which the judicial decision-makers of minor courts frequently fail to consider alternatives to cash bail, do not take into account the accused's ability to pay, and impose excessive bail for the purpose of ensuring pretrial incarceration.

36. The brief provided an example of how Montgomery County's unlawful bail procedures impacted a young mother:

> Exemplifying the need for counseled, evidentiary-and rule-based bail determinations that provide for swift reviewability is the case of a teenaged nursing mother who was incarcerated in Montgomery County for over a month due to her indigency. Bail for the teen mother was set at $50,000. It was her first time entering the criminal justice system – she had no prior arrest records. Before the county incarcerated her she breastfed her baby, lived with family, attended high school, and kept a low-wage job. She had no history of violence other than the incident for which she was arrested, which did involve a violent interaction with another girl. The facts surrounding the altercation were disputed and unproven. She had strong family supports who attended courtroom proceedings with her. She was an indigent minor who qualified for the legal services of the Office of the Public Defender…
>
> Counsel was not present at the initial bail determination. Upon learning of the teen mother's case, the assigned Assistant Public Defender filed an emergency petition seeking a bail reduction to $50,000 unsecured bail. By then the teen had already been incarcerated for over two weeks… Unfortunately, her journey through local bail practices was not an outlier.

37. The brief provided further examples:

    a. "An indigent minor with significant mental health needs remained incarcerated after participating in a fight in his residential youth placement because he could not pay $50,000 cash bail."

    b. "Another indigent client recently spent 64 days in jail awaiting trial on a minor charge of marijuana possession because cash bail was set at $5,000."

    c. "An impoverished elderly woman was held on $5,000 bail after being accused of taking a bottle of wine without paying."

    d. "And an indigent man with documented mental illness remained incarcerated on $250 bail after being charged with shoplifting Oil of Olay products that he could not afford."

    e. "Sometimes the damage is permanent but hard to quantify, such as the young Montgomery County student who missed their high school graduation awaiting a hearing on a small amount of marijuana possession because they could not pay $1,000 in bail"

    f. Another example is the indigent person with a documented seizure disorder and mental health needs who was incarcerated on $250,000 bail on charges relating to a fight that defense maintains was initiated by others.

38. Plaintiff Beer also referenced the systemic problems regarding Montgomery County's bail practices:

    a. "Montgomery County bail determinations rarely consist of informed, evidence-based analyses of individualized circumstances in accordance with the mandates of the Pennsylvania Constitution and the rules of criminal procedure."

    b. "Similar to Philadelphia, Montgomery County's MDJs routinely impose cash bail on indigent defendants without any inquiry into their ability to pay. *But c.f.* Pa. R. Crim. P. Rule 529 (stating the bail authority shall consider, inter alia, the "financial ability of the defendant" and requiring the amount to be reasonable)."

    c. "Similar to Philadelphia, Montgomery County's MDJs regularly impose excessive bail amounts for the sole purpose of ensuring pretrial incarceration, as opposed to providing assurance of future court appearances upon release. *But c.f.* Pa. R.C.P. Rule 524(C)(5)('The amount of monetary condition shall not be greater than is necessary to reasonably ensure the defendant's appearance and compliance with the conditions of the bail bond.')."

    d. "Unlike Philadelphia, however, representatives from the Montgomery County public defender's officer are rarely present during bail determinations."

  e. "Unlike Philadelphia, there are no local procedures in Montgomery County offering on-call judges to rapidly consider oral bail modification requests... It is thus not uncommon for Montgomery County detainees to sit for a month or more before getting the opportunity to request bail modification with the assistance of counsel..."

39. Finally, the brief suggested safeguards to ensure adherence to Constitutional safeguards in the bail setting process:

  a. "Because bail proceedings are not recorded or even observed by most defense counsel, however, there is no record of which of these factors bail-setting authorities rely upon when making their determinations or whether those determinations are sufficiently supported by evidence."

  b. "The absence of any statewide, fixed timeline to ensure timely review of bail decisions that result in detention is also problematic.

40. Josh Stein responded later that afternoon, copying Defendant Soltysiak,

> Dean – is this an amicus curiae brief in support of the litigation against the FJD or just an opportunity to complain about how things work in the 38th? I fully support your office in its mission to represent its clients, and if what is stated in the brief is true then I can see a desire for change. I just have to question the persuasive value of this brief for the actual underlying case. In some instances, it seems to function as an argument of how things are better in the FJD.
>
> Josh.

41. Plaintiff responded the next day to Josh Stein and Defendant Soltysiak:

> Josh,
> Thank you for your thoughts on the brief. To address your concern, the goal was not to complain. We tried to be strategic in the brief. Lee's notes below indicate why it was written the way it was. *We are hoping the Court will get a better understanding that these problems exist throughout the Commonwealth, not just in Philly and Pittsburgh. (Emphasis added)*

12

### Montgomery County Retaliates Against Plaintiff

42. On February 5, 2020, Judge DelRicci asked Plaintiff Beer to appear at his office. There, Judge DelRicci was visibly upset and, as he held a copy of the amicus brief, he asked Plaintiff what he thought he was doing. Judge DelRicci told Plaintiff that he should not have filed the brief.[1]

43. Judge DelRicci stated that if Plaintiff did not withdraw the brief he would no longer support the proposed pretrial program, that he would inform County Commissioner Dr. Valarie Arkoosh that he no longer wanted the program, and that he would not request the more than one million dollars necessary to implement the program.

44. On the morning of February 10, 2020, Judge DelRicci again asked Plaintiff if he had made a decision regarding withdrawing the brief. Plaintiff responded that he was waiting for the Commissioners' decision. Judge DelRicci then asked Plaintiff if he told Defendant Soltysiak about the Judge's threat to discontinue the pretrial program. When Plaintiff responded that he had, Judge DelRicci stated that he wished Plaintiff had not done so.

45. Upon information and belief, Defendant Soltysiak had shared the brief with Judge DelRicci and that he was acting in concert with Judge DelRicci to coerce Plaintiff into withdrawing the brief.

46. At 5:11 p.m. on February 10, 2020 Defendant Soltysiak emailed Plaintiff Beer:

> Dean,
>
> I believe the best course of action regarding the brief is to withdraw it. I believe the lack of communication both with our office and with the courts beforehand was a fatal flaw in the strategy and leaves us with very limited options. I do believe there was a way we could have had a different outcome on this issue had

---

[1] At the time Judge DelRicci confronted Plaintiff the brief had not yet been accepted as filed and was not a matter of public record, nor had the Judge been served with the brief.

> the matter been handled differently starting in December and not after the fact in February.
>
> I understand a significant amount of work went into the drafting of the brief, and I commend your office's commitment to our constituents. However, the lack of strategy and internal communication has undermined that work and is what led me to this decision.
>
> Please withdraw the brief immediately.
>
> Thank you,
> Lee

47. Plaintiff Beer then informed Judge DelRicci that he would withdraw the brief. Judge DelRicci asked that Plaintiff do it publicly, and to admit he was wrong. Plaintiff told Judge DelRicci that the brief was accurate. Judge DelRicci then requested that Plaintiff apologize to him personally. Plaintiff refused.

48. During this meeting Defendant DelRicci:

   a. Threatened Plaintiff's role as Chief Public Defender and his ability to advocate in the best interests of his clients,

   b. Told Plaintiff that he and his office he would no longer be consulted on or invited to participate in conversation regarding criminal court reforms, including bail reform,

   c. Threatened Plaintiff's law license by initially stating that he was thinking about filing a disciplinary board complaint against Plaintiff but had decided not to, then later stating that he had decided he would file a disciplinary board complaint; and

   d. Threatened Plaintiff by stating that many people in the county wanted to see him fired, but that he was not one of them.

49. On February 13, 2020 Plaintiff Beer wrote Defendant Soltysiak a letter regarding the status of his employment and his ability to effectively run the OPD, given Defendants' retaliatory actions. He stated:

> After much discussion and consultation with legal experts about the importance of demonstrating the reality of pretrial/bail issues that exist outside of Philadelphia, our office determined that it was in the best interest of our indigent clients to participate as amicus curiae by discussing county indigent defense realities outside of Philadelphia County.

50. On February 20, 2020 Defendant Soltysiak responded that "the administration has been supportive of many of the positions you have taken with respect to overall justice reform. However, in my role as COO, I have been very disappointed in the manner in which you have sought to advance those positions on a number of occasions."

51. Defendant Soltysiak provided specifics regarding "disappointment" with Plaintiff, separate from the filing of the brief, but neither was a causative factor in the dismissal of Plaintiff Beer, and neither could constitutionally justify the retaliatory termination.

52. First, Defendant Soltysiak asserted that in August 2019, Plaintiff and Deputy Chief Keisha Hudson directed summer legal interns to search police officers' public social media postings.

53. As background, in June 2019, the Philadelphia Police Department placed seventy-two officers on administrative duty and ultimately terminated thirteen officers and suspended four others after an investigation revealed offensive social media posts made against Muslim, African American, and transgender individuals.

54. Plaintiff and Deputy Chief Hudson understood that similar racist and transphobic posts would show bias that could be used to challenge the credibility of those officers in their testimony against of the OPD, and would also serve a broad public interest in identifying officers who held views that were entirely inconsistent with their sworn duty to enforce the law fairly and equally.

55. The project uncovered racially and related bias by some Montgomery County police officers, including:

   a. A Pennsylvania State Police trooper posing in blackface for his profile picture,
   b. An Upper Dublin officer claiming that the Department of Youth and Family Services "would be a much more effective agency if they just shot and killed all the unfit parents."
   c. A Lower Merion officer stating that the Central Park Five were guilty and that he won't be intimidated,
   d. An Upper Merion officer who disparaged Muslim and African American women wearing hijabs claiming that "due to the rising cost of ammunition, I'm no longer able to provide a warning shot."
   e. An Upper Moreland officer decrying those who support allowing "our government to flood our nation with Muslims." An Abington officer using an image of Confederate Gen. Robert E. Lee for his Facebook profile shot.

56. Defendant Soltysiak asserted that this project was "outside the scope of what [Plaintiff and his office] are tasked to do, as the [Social Media] research was not related to any cases being handled by [Plaintiff's] office."

57. Second, Defendant Soltysiak questioned Plaintiff's inquiries in January 2020 ( by way of a Right to Know request) in which he "raised questions about the phone rates" juvenile residents in a Montgomery County holding facility paid to a private company. Children incarcerated at the Montgomery County Youth Center were being charged more than twice what incarcerated adults were charged for their phone calls. Before making a Right to Know request in January, Plaintiff's employee reached out to the Youth Center, and the Montgomery Solicitor's Office but received no response. Plaintiff's actions on this issue were entirely proper and protected by the First Amendment.

58. On February 26, 2020, Plaintiff was informed that he and Deputy Chief Keisha Hudson had been terminated.

59. Plaintiff was terminated in retaliation for his filing of the amicus curiae brief which exposes Montgomery County's unlawful bail practices and procedures.

60. Defendants' acts and omissions in retaliating against Plaintiff for exercise of his First Amendment rights to Free Speech and to Petition were a motivating or substantial factor in his termination.

## IRREPARABLE HARM

61. The retaliation for speech and for Plaintiff Beer's efforts to fulfill his constitutional, statutory and professional responsibilities creates a profound chill on expression by Plaintiff Beer and others within the OPD thereby establishing irreparable harm. There is no legal remedy available to timely obviate this chill of free speech, a matter that has a substantial impact on the public's interest in having a Chief Public Defender who is independent and willing to advocate for the OPD's clients. Injunctive relief, under the circumstances of this case, is both necessary and appropriate.

62. Plaintiff Beer is entitled to preliminary declaratory and injunctive relief to prevent irreparable harm – the loss of his First Amendment rights – and to protect the public's interest in having a Chief Public Defender who will freely express their opinion on matters of public concern, such as the implementation of bail practices and policies across Pennsylvania.

## COUNT I

### Dean Beer v. All Defendants

### First Amendment Retaliation

63. Plaintiff incorporates by reference the allegation of the preceding paragraphs as though set fourth at length herein.

64. Montgomery County's bail practices are "a matter of public concern" as they directly impact tens of thousands of Montgomery County residents annually.

Plaintiff's ordinary job duties did not include the public reporting of Montgomery County's illegal bail practices or the filing of an amicus brief on an issue that does not directly involve representation of current clients, and is intended to support efforts to reform statewide bail practices.

65. The removal of Plaintiff Beer from his position as Chief Public Defender in retaliation for filing a brief exposing Montgomery County's illegal bail practices and policies violates his rights under the First and Fourteenth Amendments to the United States Constitution as made actionable against such defendants pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983.

66. Plaintiff has suffered and will continue to suffer economic, emotional and reputational harm as a result of the Defendants' unconstitutional actions and is entitled to reinstatement as well as damages.

67. Defendants acted under color of state law in retaliating against Plaintiff.

## COUNT II

### Dean Beer v. All Defendants

Pennsylvania Whistleblower Law

43   P.A. CONS. STAT. § 1421, *et seq.*

68. Plaintiff incorporates by reference the allegation of the preceding paragraphs as though set fourth at length herein.

69. Plaintiff is an "employee" as defined in 43 P.S. § 1422.

70. Defendant Montgomery County is an "employer" as defined in 43 P.S. § 1422.

71. The Supreme Court of Pennsylvania is an "appropriate authority" as defined in 43 P.S. § 1422.

72. Plaintiff was retaliated against and discharged in violation of 43 P.S. § 1423(a) for making a good faith, written report of wrongdoing both to Defendant Montgomery County and the Supreme Court of Pennsylvania.

73. Plaintiff reported detailed violations to Defendant Montgomery County's unlawful bail policies and procedures.

74. Plaintiff's reports were made in good faith as defined in 43 P.S. § 1422 as Plaintiff submitted the brief without malice or consideration of personal benefit and he believes the information within the brief to be true.

75. Plaintiff's reports and were not of a "merely technical or minimal nature" as Montgomery County's illegal bail procedures unlawfully deprive the citizens of Montgomery County of their liberty.

76. Plaintiff has suffered and will continue to suffer economic, emotional and reputational harm from Defendants' retaliatory actions and is entitled to reinstatement as well as damages.

## COUNT III

### Dean Beer v. All Defendants

### Wrongful Discharge In Violation Of Public Policy

77. Plaintiff incorporates the foregoing paragraphs of this Complaint as if set forth fully and at length.

78. Plaintiff filed an amicus brief challenging systemic statewide unconstitutional bail practices.

79. In retaliation for the filing of the amicus brief, Defendants terminated Plaintiff.

80. Plaintiff's termination was a violation of a clear mandate of public policy, set by the Pennsylvania Supreme Court establishing the independence of the Offices of the Public Defender throughout the Commonwealth of Pennsylvania.

## REQUESTED RELIEF

On the basis of the foregoing, Plaintiff Beer, requests the following:

a. The issuance of preliminary and permanent injunctions restoring Plaintiff Beer to the position of Chief Public Defender with a contract stating that he may only be fired for "just cause."

b. compensatory damages, including past and future pecuniary loss, emotional distress, and reputational harm;

c. punitive damages;

d. an order awarding the Plaintiff the costs incurred in this litigation including attorney's fees pursuant to 42 U.S.C. § 1988; and

e. such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Patricia V. Pierce
Patricia V. Pierce (ID No. 23129)
p.pierce@gpfflaw.com
Ronald L. Greenblatt (ID No. 50673)
ron@gpfflaw.com
Noah S. Cohen (ID No. 313849)
n.cohen@gpfflaw.com
GREENBLATT, PIERCE, FUNT & FLORES, LLC
123 South Broad Street, 25th Floor
Philadelphia, PA 19109
(215) 735-1600
*Counsel for Plaintiff*